UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| CUSTOM SEPTIC SOLUTIONS, LLC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:25-cv-00001-GFVT-EBA |
| v. | ) ) | **MEMORANDUM OPINION** |
| HYDRODYNAMIC SOLUTIONS, INC., *et al.*, | ) ) ) ) | **&** **ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court two Motions for Judgment on the Pleadings filed by the Defendants. [R. 14; R. 15.]  The Defendants seek dismissal or judgment on a number of the claims brought forth by the Plaintiffs in the First Amended Complaint.  Also before the Court are two Motions to Strike filed by the Defendants, seeking to strike the exhibits affixed to the Plaintiffs' consolidated response brief. [R. 19; R. 21.]  For the reasons that follow, the Defendants' Motions will be **GRANTED in part** and **DENIED in part**.

**I**

Custom Septic Solutions, LLC, is an installer of septic tanks, headquartered in Lawrenceburg, Kentucky. [R. 1-1 at 170.]  Custom Septic is family-owned and operated under the leadership of co-owners Shannon and Jamie Thornton and commenced operations in 2019. [*Id*. at 172; R. 18 at 2.]  Custom Septic services include both the installation of new septic tanks, as well as the performance of operations and maintenance services on existing tanks.   Custom

Septic is certified to install septic tanks manufactured by FujiClean USA, LLC[1]. [R. 1-1 at 172.] Custom Septic contracted with Hydrodynamic Solutions, Inc.[2] to purchase and install FujiClean products in Kentucky.  FujiClean does not sell its wastewater treatment products, including septic tanks, directly to either installers or end-use customers. [*Id*.]  Rather, FujiClean sells its products to distributors who exclusively market and sell FujiClean's products in a geographic territory. [*Id*.]  Custom Septic alleges its relationship with the Defendants began in 2019, when Hydrodynamic contacted Custom Septic to seek their assistance in bringing FujiClean products to market in Kentucky. [*Id*. at 175.]  Since that time Custom Septic alleges to have installed six FujiClean systems in Kentucky, including the first FujiClean cluster system. [*Id*. at 172.]  It also alleges, however, that problems began almost immediately.   Seven different factual encounters between Custom Septic, Hydrodynamic, and FujiClean form the basis of this case.

Custom Septic contends Hydrodynamic provided it with actionable misinformation from the beginning of their business relationship. [*Id*. at 175.]  Custom Septic provides that Kelli Oakley, managing member of Hydrodynamic, "informed Mr. Thornton that only the Fuji certification and a license to install septic systems from the State of Kentucky would be required." [*Id*.]  Custom Septic states that it did not rely on this information and instead investigated further. [*Id*.]  Custom Septic learned through its own research that an additional certification, referred to as the Wastewater I certification, is required from the Kentucky Division of Water to install and maintain FujiClean systems which discharge to the surface. Custom Septic complied with this legal requirement and obtained the certification. [*Id*.]  Custom Septic

---

[1] The First Amended Complaint alleges that co-defendants Scott Samuelson and Mike Dunn are owners, officers, agents, or employees of FujiClean.
[2] The First Amended Complaint alleges that co-defendants Kelli Oakley and Mike Beale are officers, employees, or agents of Hydrodynamic, and that co-defendant Alan Davis is an owner, officer, agent or employee, of Hydrodynamic.

claims that other installers blindly relied on Hydrodynamic's incorrect information, and have installed non-compliant, surface-discharging FujiClean systems around the Commonwealth. [*Id.*] Custom Septic provides that it may suffer future harm as a result of this misinformation because it may provide operations and maintenance services upon a non-compliant FujiClean tank. [*Id.*]

In early 2021, Hydrodynamic contracted Custom Septic to install the first FujiClean cluster system in Kentucky, which is referred to as the Isaiah House project. [*Id.* at 176.] Custom Septic alleges that the Isaiah House project "was affected by personal discord between Ms. Oakley and another former employee of [Hydrodynamic]." [*Id.*]  Custom Septic claims to have mediated this issue, and to have successfully completed the project. [*Id.*]  Subsequently, Custom Septic provides that Hydrodynamic approached it "to inquire as to whether the [Hydrodynamic] entity could purchase or absorb [Custom Septic]." [*Id.*]  Custom Septic provides that it declined two offers for a merger or acquisition. [*Id.*]  Subsequent to these merger discussions, Custom Septic contends that "the [Hydrodynamic] Defendants routinely failed to communicate with Plaintiffs regarding details that are essential to the successful installation of Fuji systems," and that Hydrodynamic "have become increasingly adversarial in their interactions with Plaintiffs."  Further, Custom Septic provides that "the [Hydrodynamic] Defendants have been providing incomplete or tortiously inaccurate information to [FujiClean] regarding Plaintiffs' work and the business dealings between [Custom Septic] and [Hydrodynamic]." [*Id.* at 177.]

The major rift between the Parties began to unfold around the performance of a septic tank installation at property owned by Julie and Jeremiah Six, who were clients of Custom Septic.  The following represents the Plaintiffs' recounting of the events.  The problems began when, in December 2021, the FujiClean system was shipped to Custom Septic by Hydrodynamic

but was sent to the wrong address. [*Id*.]  This error was the result of multiple errors on the order ticket by Hydrodynamic. [*Id*.]  Eventually, the tank was located and installed by Custom Septic. Prior to installation, Custom Septic discovered that the tank had a broken recirculation line, but this was repaired prior to installation. [*Id*.]

Almost immediately after installation, it was discovered that the tank had a leak. [*Id*. at 177-78.]  The leak was reported by Hydrodynamic to FujiClean, who both provided a replacement tank and paid Custom Septic directly for its installation. [*Id*. at 178.]  On December 16, 2021, Mr. Thornton dug out the first tank by hand, to prevent any further damage to the tank during its excavation. [*Id*.]  Hydrodynamic had arranged for its representative, Mike Beal, to be present for the excavation, but he did not arrive until after the work was completed. [*Id*.]  The second tank was installed the following day by Custom Septic, and its correct installation was verified by Mr. Beal. [*Id*.]

Custom Septic contracted with the Sixes for the operation and maintenance of their septic tank.  In December 2022, as part of the routine six-month inspection, Custom Septic discovered that the Sixes added a "substantial amount" of backfill to the site around the tank, and Custom Septic informed Hydrodynamic of this development. [*Id*.]  Hydrodynamic advised Custom Septic to place risers on the second tank to bring the chamber lids to grade, but that this was ultimately not a warranty issue. [*Id*.]  No issues with the septic tank's performance were discovered at this inspection, however. Another inspection on July 10, 2023, also revealed no issues with the tank. [*Id*. at 179.]

On August 19, 2023, an alarm was triggered on the Sixes' tank, indicating an issue was amiss.  Custom Septic responded to the alarm, promptly notified Hydrodynamic, and offered "to assist with the repair of the system." [*Id*.]  Based on its own understanding of the warranty

language, Custom Septic believed that the issue would fall within FujiClean's two-year warranty, under which FujiClean "will service and repair the installed unit including all parts and labor that show evidence of defect or unacceptable performance for any reason…" [*Id*.; R. 18 at 9.] FujiClean did not, however, offer Custom Septic a contract or a scope of work to perform the necessary repairs. [*Id*. at 180.] A FujiClean representative contacted Custom Septic directly to state that it would cover "fair and reasonable compensation" for the necessary repairs and advised that it had been in direct contact with the Sixes. [*Id*. at 180-81.] In a later correspondence, FujiClean stated to Custom Septic that it would utilize its own contractor to perform the repairs. FujiClean first recommended Paul Ballard to the Six's, but they refused to contract with Mr. Ballard. [*Id*. at 180.] FujiClean next recommended Chris Hartman, who the Sixes considered suitable, and FujiClean contracted with Hartman to perform the requisite repairs. [*Id*. at 180-81.]

Mr. Thornton was on-site to observe the excavation of the second tank, at the request of the Sixes. [*Id*. at 181.] Thorton alleges that FujiClean's representative, Mike Dunn, became "verbally aggressive" with him, and the hostile interaction was captured on doorbell footage. [*Id*.] Thornton also provides that neither Dunn, nor Oakley, were on site to oversee the excavation until after heavy equipment was used in close proximity to the tank to facilitate its removal. [*Id*.] Based on Thornton's observation and experience, he opined that the damage was caused by heavy equipment at some time after its installation. [*Id*.] In other words, he believed that the evidence showed that the malfunction was not the result of Custom Septic's installation or maintenance. However, Custom Septic alleges that it was not afforded the opportunity to inspect the tank after excavation. [*Id*. at 182.] Custom Septic alleges it was not provided with a written report for several months after the excavation, until it was provided a copy of a warranty

5

report authored by FujiClean's Mike Dunn ("the Dunn Report"). [*Id.*]

Following the installation of the third tank, additional issues were encountered, specifically related to low water. [*Id.* at 181.] Custom Septic contends that the entirely different manner in which FujiClean and Hydrodynamic addressed these issues with the third tank, when compared to the second tank debacle, evidences their malicious intent. [*Id.*] Custom Septic provides that FujiClean and Hydrodynamic "provid[ed] detailed inspections of the unit and engineering support to Hartman relating to the same in an effort to determine the problem[.]" [*Id.*] In Custom Septic's view, these were services and opportunities it was not afforded.

After the installation of the third tank, Custom Septic argues that Hydrodynamic and FujiClean took additional steps to interfere with the business relationship between it and the Six's. [*Id.* at 182.] For example, Custom Septic alleges that the Defendants refused to provide it with the serial or warranty numbers for the third tank, which impairs their ongoing business relationship embodied in the operations and maintenance contract between Custom Septic and the Sixes. [*Id.*] Further, Custom Septic contends that no application to modify the existing septic tank permit was filed with the Commonwealth prior to the third tank's installation, or since. [*Id.* at 182-83.] Custom Septic alleges, therefore, that the third tank, which it is obligated to operate and maintain, is legally defective through no fault of its own, and could lead to future legal violations. [*Id.*]

Further issues simmered around a different installation – the Richards project – beginning in March 2022. Again, the following facts represent the Plaintiffs' factual allegations, construed as true, as required at this procedural posture. Custom Septic was contacted by Michael Richards in regard to the installation of a new septic system, and Custom Septic provided him with a $21,350 bid for the installation of a new FujiClean-manufactured system. [*Id.* at 183.] In

6

addition, Custom Septic also applied for and obtained the requisite permits and began drafting an operations and maintenance agreement for Mr. Richards's review. [*Id.*]  Initially, Paul Ballard was contracted to perform the excavation work, while Custom Septic would perform the installation work, because Mr. Ballard had not yet completed the FujiClean certification program required to install their products in Kentucky, or elsewhere. [*Id.*]

Custom Septic alleges that Hydrodynamic, with knowledge of their ripening business arrangement with Custom Septic, conspired with FujiClean to fast-track Ballard's certification under reduced requirements, wrongfully disseminated Custom Septic's trade secrets, and offered Ballard more favorable terms than those offered to Custom Septic in an effort to undermine its relationship with Mr. Richards. [*Id.* at 183-84.]  Specifically, in terms of the FujiClean certification, Custom Septic claims that FujiClean waived the normal requirement that an installer complete one full FujiClean installation in the presence of an FujiClean supervisor before receiving the certification. [*Id.* at 184-85.]  Ultimately, Richards contracted with Paul Ballard for the installation work. [*Id.* at 184.]

Custom Septic further alleges that this, in turn, created a "conflict of interest" thereby preventing Custom Septic from entering into an operations and maintenance agreement with Richards. [*Id.* at 184.]  Custom Septic provides that it was unable to do so because it knew that Ballard lacked the requisite certifications – both through FujiClean (under its normal terms, at least), or through the Commonwealth – to legally install the system. [*Id.*]  Custom Septic, therefore, informed the Commonwealth that Ballard performed the installation work, requested that the original permit issued to it be voided, and requested that Custom Septic not be listed as the operations and maintenance provider. [*Id.*]  Consequently, Custom Septic argues that these actions deprived it of a future, continuous line of business.

A third, and final, business transaction – the Flaherty project – also underlies the Plaintiffs' complaint. Once again, the following factual assertions are derived from the First Amended Complaint and construed as true. Custom Septic contacted Hydrodynamic in September 2023 to place an order for a new FujiClean system which it planned to install for its customer, Douglas Flaherty. [*Id.* at 185.] Upon doing so, Custom Septic was informed by Hydrodynamic that it had decided to "change many of its policies with regard to the sale of Fuji systems to [Custom Septic]." [*Id.*] Custom Septic contends that these policy changes were unique to it and were not applied to other FujiClean installers operating in Kentucky. [*Id.*]

Prior to these changes, Custom Septic purchased FujiClean systems through Hydrodynamic by paying an initial deposit of 60% and paid the remaining 40% following installation. [*Id.*] Under the new terms, Hydrodynamic would require Custom Septic to pay 100% up front on all purchases through Hydrodynamic. [*Id.*] Hydrodynamic also informed Custom Septic that the FujiClean warranty would be valid only if Custom Septic provided it with pre- and post-installation photos of the septic tank unit. [*Id.* at 185-86.] Custom Septic alleges that this evidentiary requirement is not required of other FujiClean-certified installers, whose warranties are activated automatically upon installation. [*Id.*] Custom Septic further contends that requiring disclosure of its installation process encroached on its ability to protect its confidential trade secrets. [*Id.* at 186.]

Finally, as relevant here, Custom Septic alleges that, in February 2024, FujiClean provided it with a copy of the Dunn Report, which discussed the issues around the installation and defect in the second tank at the Six property. [*Id.* at 189.] Custom Septic contends that the Dunn Report contained numerous factual inaccuracies and mischaracterizations, which, taken together, place blame for the issues with Custom Septic. [*Id.* at 189-93.] Custom Septic further

8

contends that while Hydrodynamic did not co-author this report, the report is at least premised in part on misstatements made by Hydrodynamic to FujiClean about the work performed by Custom Septic, and their business relationship.  Custom Septic provides that it immediately contacted FujiClean to rectify these purported inaccuracies immediately following receipt of the report, but FujiClean did not discuss the inaccuracies further with Custom Septic. [*Id.*]  Instead, Custom Septic alleges that the Dunn Report formed the basis for a presentation given by FujiClean at its annual international conference in Florida later in February 2024. [Id. at 20.] Custom Septic alleges, therefore, that it and the Thorntons were defamed by the publication of the Dunn Report and its distribution at the conference.  Custom Septic also claims it was separately defamed by the written statements sent from Hydrodynamic to FujiClean which formed the basis of the Report.

Plaintiffs filed an initial complaint in this matter in April 2024 in Anderson Circuit Court. [R. 1-1.]  On December 9, 2024, Plaintiffs sought leave to amend their complaint, which was granted by order of the Anderson Circuit Court on January 10, 2025. [R. 1-1 at 166, 264.] Defendants removed the case to this Court on January 15, 2025. [R. 1 at 1.]  On September 2 and September 3, 2025, respectively, the Defendants filed the instant motions to dismiss, or, in the alternative, for judgment on the pleadings. [R. 14; R. 15.]  Following the filing of the Plantiffs' combined response brief, the Defendants also filed motions to strike the exhibits affixed thereto. [R. 19; R. 21.]  These motions are now fully briefed and ripe for judicial review.

**II**

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  "The standard of review for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which

9

relief can be granted." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citing *Zeigler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citations omitted). Additionally, court can examine "public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss, as long as they are referred to in the [c]omplaint and are central to the claims contained therein" without transforming a motion for judgment on the pleadings into a motion for summary judgment. *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

As is the case with a motion to dismiss under Rule 12(b)(6), in a Rule 12(c) motion for judgment on the pleadings, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all inferences in favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citations omitted). The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)). The Supreme Court explained that in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**A**

At the outset, the Court must address two Motions to Strike, filed by the Defendants. Hydrodynamic seeks to strike the exhibits filed by Custom Septic in conjunction with their

combined response to Defendants' motions for judgment on the pleadings. Specifically, Hydrodynamic contends that these exhibits violate the agreed protective order and are unnecessary and irrelevant to the present motions before the Court. [R. 19-1 at 3.] FujiClean joined in this motion. [R. 21 at 1.] In response, Custom Septic states that "the law is clear that it is within the district court's discretion to consider such matters, although doing so converts the motion into one for summary judgment." [R. 23 at 2.] It further provides that the use of the documents here does not violate the protective order and are relevant to the motion before the Court. [*Id*. at 3.]

A court may strike material under Federal Rule of Civil Procedure 12(f). "Under Rule 12(f), a court may strike from a pleading 'any redundant, immaterial, impertinent, or scandalous matter." *Schirmer v. Powell Cnty. Det. Ctr.*, 685 F. Supp. 3d 459, 465 (E.D. Ky. 2023). "A 'motion to strike should be granted only when the pleading to be [stricken] has no possible relation to the controversy.'" *Clark v. Roccanova*, 772 F. Supp. 2d 844, 850 (E.D. Ky. 2011) (quoting *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)). "Motions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Local 324 Health Care Plan v. G&W Construction Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citing *Brown & Williamson Tobacco Corp.*, 201 F.2d at 822).

**1**

First, and ultimately most critically, the Court will address Custom Septic's argument that the Court should consider the attached exhibits as a matter of judicial economy and, in so doing, convert the Defendants' motions to motions for summary judgment. "Under Rule 12(d), '[i]f, on a motion under Rule 12(b)(6) or 12(c) matters outside the pleadings are presented to *and not excluded by the court*, the motion must be treated as one for summary judgment under [Federal

11

Rule of Civil Procedure 56.]'" *Turek v. PNC Bank*, 2021 U.S. App. LEXIS 6861 at *7 (6th Cir. Mar. 9, 2021) (quoting Fed. R. Civ. P. 12(d)) (emphasis added). Additionally,

> [A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment.

*Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). This is appropriate where the exhibits do "nothing more than verify the complaint" and contribute "nothing new[.]" *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993). Anything more, however, requires the Court to convert the motion pursuant to Rule 12(d). Ultimately, the decision to convert a motion for judgment on the pleadings to a motion for summary judgment lies in the sole discretion of the district court. See *Turek*, 2021 U.S. App. 6861, at *9 (holding that the district court did not err in denying conversion under Rule 12(d) because "the court was under no obligation to do so.").

In order to consider the exhibits at issue here, the Court would be required to convert the Defendants' motions to summary judgment motions. The material included in the exhibits, obtained in the early stages of fact discovery in this case, do much more than "verify the complaint." Rather, they add additional facts and details largely unavailable to Custom Septic at the time the complaint was filed and go well beyond the factual assertions contained within the pleadings. [*See* R. 18-1; R. 18-2; R. 18-3; R. 18-4; R. 18-5; R. 18-6.] Additionally, this is not a circumstance in which the movant has moved for judgment on the pleadings or, in the alternative, for summary judgment. In this common practice, the movant might include the exhibits at the outset, leaving it up to the Court to decide how best to proceed. Here, it is the non-moving party which seeks to introduce exhibits and unilaterally convert the opposing party's motion. Given the procedural posture of this case, and the high volume of briefing present even

12

excluding the Plaintiff's exhibits, the Court finds that converting the Defendants' motions is not proper at this time.

Consequently, because the Defendants' motions will be construed as motions for judgment on the pleadings, the Court will not consider Custom Septic's exhibits, which go well beyond the four corners of the pleadings.

**2**

Next, the Court must address the Defendants' additional argument that regardless of whether the exhibits are considered as part of the motions for judgment on the pleadings, they should nonetheless be stricken because their presence in the record because they violate the Parties' agreed protective order. In response, Custom Septic contends that striking the exhibits from the record is improper because they "consist[] solely of routine business correspondence and publicly available information, none of which reveals trade secrets, sensitive personal data, or other information protected under applicable law." In other words, Custom Septic argues that because the exhibits were improperly designated as "confidential" by the Defendants, they should remain in the public record.

The Parties' agreed protective order, entered by the Anderson Circuit Clerk on September 18, 2024, contains a provision delineating the process by which a party can dispute a confidential designation by an opposing party. [R. 1-1 at 130.] In the event of such a dispute, first, "the objecting party shall consult with the designating party to attempt to resolve their differences." [*Id.*] Then, "[i]f the objecting party and designating party are unable to reach an accord as to the proper designation of the material, after giving notice to the designating party, the objecting party may apply to the Court for a ruling that the material shall not be so designated." [*Id.*] Regardless, however, the agreed protective order provides that "[a]ny documents or other

materials that have been designated "CONFIDENTIAL" shall be treated as such until such time as the Court rules that such materials should not be treated as such." [*Id.*]

The evidence presented by the Parties demonstrates that Custom Septic did not follow this process before filing the exhibits into the record alongside the response brief, notwithstanding their confidential designation.  Custom Septic does not contend that it adhered to the procedures set forth in the protective order, it merely argues that "[t]he emails are marked 'Confidential' by the Defendants, but do not contain confidential or proprietary information[,]" and thus, "may be property used in connection with this litigation and shared with the Court." [R. 23 at 3.]  Ultimately, this argument is rendered irrelevant by the fact that Plaintiffs did not follow the proper procedure, which they agreed to, for raising this argument.

In short, the Parties' agreed protective order sets forth the process by which a party may dispute a document's confidential designation.  Until that process is followed, the document remains confidential and, thus, not subject to public disclosure in the record.  Here, Custom Septic ignored this procedure and filed the documents into the record anyway, because it believed the documents did not contain confidential information.  This is irrelevant.  The Court, therefore, must strike these exhibits from the record as a result of Plaintiffs' disregard for the procedural safeguards to which it agreed.

**B**

First, Custom Septic claims that the collective conduct of Hydrodynamic and FujiClean violates the Kentucky Consumer Protection Act.  Broadly speaking, the Kentucky Consumer Protection Act "makes unlawful '[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" *Belt v. Cin. Ins. Co.*, 664 S.W.3d 524, 531 (Ky. 2022) (citing Ky. Rev. Stat. § 367.170).  "Additionally, KRS § 367.220 authorizes a statutory cause of

action for violations of the KCPA." *Id.*  That provision provides that "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property," as a result of the practices deemed unlawful by the Kentucky Consumer Protection Act may bring an action. See Ky. Rev. Stat. § 367.220.  Courts consistently hold that the Kentucky Consumer Protection Act does not apply to consumers who purchase products for commercial, as opposed to personal or household, use. See *Powerscreen USA, LLC v. D & L Equip., Inc.*, 661 F. Supp. 2d 705, 716 (W.D. Ky. 2009) (holding that the products, large crushing and screening equipment used in large commercial operations, were not redressable under the KCPA); see also *Hunt Enterprises, Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697 (W.D. Ky. 1997) (holding that the industrial equipment at issue "does not qualify as goods for personal, family or household purposes.").

Here, Custom Septic provides that it asserted a KCPA claim "out of an abundance of caution." [R. 18 at 23.]  Custom Septic thus, "concede[s] that judgment with regard to Count 1 in favor of Defendants is appropriate because Kentucky courts have rejected similar claims wherein businesses tried to assert derivative or 'in the shoes of the consumer' claims under the KCPA." [*Id.*]  The Court agrees.  Custom Septic, as a commercial installer, did not purchase the product from Hydrodynamic for "personal, family, or household use."  Because Custom Septic's claims fall squarely outside the scope of the KCPA, Count One presents a claim upon which the Court is unable to grant relief.  Consequently, the Court will dismiss Count One of the First Amended Complaint with respect to all Defendants.

C

Custom Septic next contends that the actions of FujiClean violate the Kentucky Unfair Trade Practices Act, and specifically the provision included at Ky. Rev. Stat. § 365.050. [R. 1-1

15

at 194.]  Ky. Rev. Stat § 365.050 provides:

> The secret payment or allowance of rebates, refunds, commissions or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor, and where such payment or allowance tends to destroy competition, is an unfair trade practice, and no person shall resort to such trade practice.

To succeed on such a claim, Custom Septic must demonstrate: "(1) a secret payment, (2) made to the injury of a competitor, (3) which tends to destroy competition." *Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d 804, 812 (E.D. Ky. 1999) (citing *Jefferson Ice & Fuel Co. v. Grocers Ice & Cold Storage Co.*, 286 S.W.2d 80, 83 (Ky. 1955)).  An intent to destroy competition is not required. *Jefferson Ice & Fuel Co.*, 286 S.W.2d at 83.  Caselaw in this area is sparse, and the statute has been cited only a handful of times since its enactment.

Custom Septic states that FujiClean violated this statute on at least two separate occasions.[3]  First, and most critically here, Custom Septic contends that "Fuji imposed additional requirements upon Plaintiffs in connection with obtaining a Fuji certification to install Fuji tanks in Kentucky." [R. 18 at 25.]  More specifically, Custom Septic provides that its owner, co-plaintiff Shannon Thornton, was required to perform an installation of a FujiClean tank under the supervision of an FujiClean employee in order to obtain his FujiClean certification.  Custom Septic claims that this same requirement was not imposed on Paul Ballard, a competitor of Custom Septic, "who was awarded his Fuji certification without any prior Fuji installations." [*Id*.]  Thus, Custom Septic argues that this inconsistent application of the requisite policy to obtain the FujiClean certification amounts to a secret extension of "special services or privileges

---

[3] A third purported violation of Kentucky Unfair Trade Practices Act was discussed by Custom Septic in their response brief, but is not discussed here, because it relied solely on information contained with the exhibits, rather than the First Amended Complaint.  Because the Court construed the motions as those for judgment on the pleadings, rather than summary judgment, the Court cannot and will not consider this extrinsic evidence at this time.

not extended to all purchasers purchasing on like terms and conditions."

Additionally, Custom Septic further alleges that FujiClean also violated the Kentucky Unfair Trade Practices Act by refusing to either offer a scope of work, or enter a contract with, Custom Septic to repair the second tank at the Six property.  According to Custom Septic, this determination lied solely with FujiClean, which was directly financially responsible for the repairs of the Six tank, pursuant to its warranty.  By instead contracting with Chris Hartman, a competitor of Custom Septic, Custom Septic claims FujiClean "directly eliminat[ed] competition with regard to the excavation and replacement of the Sixes' second tank." [R. 1-1 at 181-83; R. 18 at 24.]

**1**

FujiClean contends that this claim should be dismissed on several bases.  First, FujiClean provides that Custom Septic's claim must fail because FujiClean and Custom Septic are not "competitors" within the meaning of the statute.  FujiClean contends that because FujiClean is a manufacturer of septic products, and Custom Septic is an installer of those products, the two companies are not in direct competition with one another. [R. 15-1 at 9-10.]  FujiClean quotes from a sentence from *Powerscreen*, which provided that the defendants could not be held liable because the parties were "seller and distributor, not competitors." *Powerscreen*, 661 F. Supp. 2d at 716.  FujiClean opines that because "[FujiClean] and [Custom Septic] are not even in a seller-distributor relationship," that "their relationship is more attenuated than that of the parties in *Powerscreen* and are not competitors."  Thus, FujiClean urges that Count II must fail because FujiClean and Custom Septic are not competitors and, thus, the second *Jefferson Ice & Fuel* element is not satisfied.

Applicable Kentucky caselaw provides, however, that the meaning of the term

17

"competitor" should not be read as narrowly, in the context of the Kentucky Unfair Trade Practices Act, as FujiClean urges.  In *Belfry Coal Corp. v. East Kentucky Beverage Co.*, the Kentucky Court provided:

> KRS 365.020 [*et seq.*] … seems to indicate that aggression need not be directed toward an actual competitor in the same field, it protects persons against any one whom the seller of the commodity – whatever the reason – might wish to hurt. The statute seems to be directed mainly at price cutting, rebates, and other devices which might aid in driving a competitor out of business to the extent that it is even prohibited that a person sell at less than cost if the purpose is to injure competitors, KRS § 365.030.

*Belfry Coal Corp. v. E. Ky. Beverage Co.*, 294 S.W.2d 539, 540 (Ky. 1956).  In other words, the plaintiff and defendant need not be direct competitors for a Kentucky Unfair Trade Practices Act claim to be viable.  Rather, the defendant's actions must have the effect of causing injury of one competitor (i.e., the plaintiff) among several peer competitors; it does not matter that the defendant is not itself among the competitors.  While the Court acknowledges that the *Belfry Coal Corp.* Court addressed the meaning of "competitor" in the context of a claim under Ky. Rev. Stat. § 365.020, it is reasonable to presume that the same meaning can reasonably be ascribed to the term as used elsewhere within the Kentucky Unfair Trade Practices Act.[4]

FujiClean contends that *Belfry Coal Corp.* is factually distinguishable from the present dispute, because there "the plaintiff asserted a claim directly against the distributor who was selling to the plaintiff and to the plaintiff's competitor alleging unfair treatment between the competitors." [R. 20 at 3.]  FujiClean believes that *Belfry Coal Corp.* is inapplicable here because "[FujiClean] … did not sell products directly to Plaintiffs or Plaintiffs' competitors, and

---

[4] Ky. Rev. Stat. § 365.020 provides, in relevant part, "No person … with the intent to destroy the competition of any regular established dealer … shall discriminate between different sections, communities or cities, or portions thereof or locations therein, in this state, by selling or furnishing such commodity … at a lower rate in one section, community or city … than in another …

therefore did not control Plaintiffs' purchase terms." [*Id*.]  The Court agrees that the factual basis of *Belfry Coal Corp.* is distinguishable from that at bar.  And, as already stated, *Belfry Coal Corp.* involved a claim for violation of Ky. Rev. Stat. § 365.020, rather than Ky. Rev. Stat. § 365.050, as here.  Nevertheless, the Kentucky Court's interpretation of the scope of the word "competitor" is equally applicable in both contexts.

As an additional matter, FujiClean misreads and misapplies the holding of *Powerscreen* in this context.  Although the *Powerscreen* Court determined that the claim could not stand because the parties "are seller and distributor, not competitors[,]" the underlying claim in *Powerscreen* was for common law unfair competition, rather than a statutory violation of the Kentucky Unfair Trade Practices Act.  This conclusion is further evidenced by the *Powerscreen* Court's citation to an earlier case, *Covington Inn Corporation v. White Horse Tavern, Inc.*, to support its assertion. *Id*. (citing 445 S.W.2d 135, 138 (Ky. 1969).  A quick reading of *Covington Inn* reveals a robust discussion of the common law tort of unfair competition, which was codified at Ky. Rev. Stat. § 271.045(2) and has since been repealed.[5] *Covington Inn*, 445 S.W.2d at 137-40.  That particular subsection "provide[d] that a corporate name shall not be the same as, 'nor deceptively similar to' the name of other corporations." *Id*.  In short, the citation from *Powerscreen* which FujiClean relies heavily on pertains to an entirely different cause of action premised on a different statutory framework.

In short, then, the defendant in an action brought under the Kentucky Unfair Trade Practices Act need not be a direct competitor of the plaintiff; rather, this prong is satisfied where the plaintiff is harmed relative to the plaintiff's competition.  Here, when the facts are construed in the light most favorable to the Plaintiff, Custom Septic has pleaded a plausible claim of injury

---

[5] Ky. Rev. Stat. Chapter 271 was repealed and replaced by the Kentucky Business Corporation Act, codified at Chapter 271B.

relative to its competitors as a result of the actions at issue.

**2**

Next, Custom Septic also alleges that FujiClean does not directly contract with or sell directly to Plaintiffs or any of their competitors, and instead only contracts with distributors such as Hydrodynamic.  In turn, FujiClean states that it "does not dictate or control what pricing [Hydrodynamic] charges when reselling products it purchased from [FujiClean]." [R. 15-1 at 9.]  As a result, then, FujiClean posits that it "does not make, and has never made, any 'secret payment or allowance of rebates, refunds, commissions or unearned discounts' to Plaintiffs or to any of their competitors." [*Id*.]  In other words, FujiClean also contends that Custom Septic's claim falls short on the first *Jefferson Ice & Fuel* element.

FujiClean, however, reads the statute too narrowly.  Demonstrating a "secret payment or allowance of rebates, refunds, commission, or unearned discounts" is but one way to demonstrate a legal violation under Ky. Rev. Stat. § 365.050.  The drafters separated this clause with the disjunctive "or", indicating there are multiple forms of conduct proscribed by the statute.  The statute likewise makes unlawful "secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing on like terms and conditions."  Despite FujiClean's overly narrow construction of the statute, Custom Septic's claim still runs around, at least with respect to FujiClean, on this element.

Under either "path" for establishing liability, "[t]he secret payment or allowance of rebates, refunds, commissions or unearned discounts," or "secretly extending to certain *purchasers* special services or privileges not extended to all *purchasers* purchasing on like terms and conditions," the statute presupposes that the parties are in a direct supplier-purchaser relationship. *See* Ky. Rev. Stat. § 365.050 (emphasis added).  While the second clause explicitly

20

discusses "purchasers," the first clause implies the relationship by using terms such as "rebate," "refund," and "discount."  In order to be given a rebate, a refund, or a discount, a person must either be presently purchasing an item, or have purchased one in the past.  Custom Septic implicitly acknowledged as much when it characterized the holding from *Warfield Tobacco Inc. v. R.J. Reynolds Tobacco, Inc.*, as follows: "claims have been permitted to proceed when the allegation is that a manufacturer has attempted to destroy competition by secretly offering more favorable terms, conditions, or pricing to *purchasers* of its products who are in competition with one other." [R. 18 at 24] (emphasis added) (citing 34 F. Supp. 2d 1050 (E.D. Ky. 1999)).  In other words, the plaintiff and defendant-manufacturer must be in a seller-purchaser relationship for liability to attach.

Custom Septic does not purchase any products directly from FujiClean, nor does it claim to.  Consequently, under either theory of liability, Custom Septic's claim falls short with respect to FujiClean.  FujiClean sells its products to distributors, in this case Hydrodynamic, which in turn sells the septic tanks to installers on a regional basis, such as Custom Septic.  Specifically here, Custom Septic and FujiClean are not in a seller-purchaser relationship where Custom Septic is subjected to differing requirements from its competitors in obtaining a certification to install FujiClean septic tanks.  Custom Septic does not allege that it was required to *purchase* the certification from FujiClean.  Rather, FujiClean utilizes the certification process to dictate which installers are authorized to install their products, which inevitably bears on their business judgment, either by virtue of potential reputational harm or for future warranty claims, if products are installed incorrectly.  The certification process, therefore, serves as a means of quality control, rather than the sale of a product or service.  Thus, it cannot serve as the basis for liability under Kentucky Unfair Trade Practices Act.

Likewise, Custom Septic and FujiClean are not in a seller-purchaser relationship when FujiClean elects to contract with a different installer to perform repairs to a septic tank, for which FujiClean is solely responsible under the warranty agreement with the customer.  Here, Custom Septic is not purchasing anything at all.  Rather, it is jockeying among its competitors for a bid from FujiClean for a potential project, for which it would be compensated.  In a way, this is actually an inverse relationship.  Custom Septic is essentially seeking to get FujiClean, the manufacturer, to purchase its installation services to perform a repair obligation on its behalf. FujiClean does not engage in a proscribed trade practice merely by electing to contract with a different installer to perform the work.  Custom Septic presents no evidence to suggest it was entitled to the work, via a first right of refusal or otherwise.[6]  Therefore, this also fails to establish a plausible violation.

Custom Septic fails to bring a viable claim under Count II for a violation of Kentucky Unfair Trade Practices Act against FujiClean.  Therefore, Count II must be dismissed as to FujiClean, although it will proceed as to Hydrodynamic, which did not seek dismissal of this claim.

**D**

Next, in Count III of the First Amended Complaint, Custom Septic claims that the conduct of the Defendants violated the Kentucky Uniform Trade Secrets Act, Ky. Rev. Stat. § 365.880 *et seq*.  In order to state a viable claim under the KUTSA, the plaintiff must demonstrate that "(1) it had a trade secret; and (2) the defendant(s) misappropriated the trade secret." *Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 S.W.3d 803, 818 (Ky. Ct. App. 2017) (internal citations omitted).  "A trade secret is information that derives independent economic value 'from

---

[6] Even if Custom Septic made such a claim, the proper mechanism for recovery would be by virtue of a breach of contract claim, rather than a claim for unfair trade practices.

being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use,' and is the 'subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Id*. (quoting Ky. Rev. Stat. § 365.880(4)).  In order to be considered a trade secret, the information must: "(1) have independent economic value; (2) not be generally known or readily ascertainable by proper means; and (3) be the subject of reasonable efforts to maintain its secrecy. *Id*. (citing *BDT Prods. Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 890 (E.D. Ky. 2003).  "Whether a particular type of information constitutes a trade secret is a question of fact." *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 672 (E.D. Ky. 2009).  As to the second element, misappropriation, "a defendant 'misappropriate[s] a trade secret if [the defendant] used it without proper consent, if the trade secret was disclosed improperly, or if it was acquired through improper means." *Alph C. Kaufman, Inc,* 540 S.W.3d at 819 (quoting *Fastenal Co.*, 609 F. Supp. 2d at 672).

FujiClean seeks judgment on the pleadings on the basis that none of the information that it allegedly misappropriated constituted a trade secret.  Custom Septic contends that its "methods of installation, client lists, marketing plans, and other confidential and protected information," constituted trade secrets. [R. 1-1 at 195.]  FujiClean contends that the methods and process for installation "constitute general knowledge in the industry," meaning that it cannot be considered a trade secret. [R. 15-1 at 11.]  FujiClean further contends that Custom Septic's client lists and marketing strategy likewise cannot be considered a trade secret because Custom Septic regularly shares this information with outside parties, including distributors and manufacturers. [*Id*.]

In support of its argument, FujiClean relies heavily on *Insight Kentucky Partners II, L.P. v. Preferred Automotive Services, Inc.*, to support its claim that the information in question did not constitute trade secrets.  514 S.W.3d 537 (Ky. Ct. App. 2016).  In that case the Court

23

addressed whether information related to a company's "operations, pricing, business arrangements, suppliers, customers, parts warranties, and vehicle repair histories," constituted a trade secret. *Id*. at 555. The Court held that this information held no "independent economic value" because the company's profit was derived strictly from the fact that the customer chose to have its fleet of vehicles maintained by the company, and thus not a trade secret. *Id*. The Court also remarked that "it is questionable whether the information at issue is even confidential much less trade secrets[,]" but ultimately did not reach this question. *Id*.

Here, Custom Septic has pleaded a plausible claim under the Kentucky Uniform Trade Secrets Act sufficient to survive judgment on the pleadings. The information available to the Court regarding Custom Septic's installation methods, client lists, and marketing plans leave more questions than answers. First, with respect to information lists, there is no evidence before the Court to suggest that Custom Septic's installation methods for FujiClean systems are generally known throughout the industry. On the contrary, FujiClean's insistence upon certifying all installers who are authorized to install their systems indicates that there is a relative degree of complexity in their installation, and that not every installer is up to the task. As to Custom Septic's client lists, it is possible that some information is readily available, but some of this information could be considered a trade secret by a jury. For example, it may take great time and expense to discover which properties utilize a septic tank, as opposed to municipal sewer services. It would be even more costly to determine the particular brand or manufacturer of tanks in the locality. At bottom, a jury could find that this information carries independent economic value for a septic tank installer, is not readily ascertainable, and that Custom Septic reasonably undertook to safeguard its secrecy. The same is true for Custom Septic's marketing strategies. Ultimately, the question of whether certain information constitutes a trade secret is a

24

question of fact. For this reason, the Court is unable to grant judgment to FujiClean on this claim.

E

Count IV of the First Amended Complaint brings a claim for an illegal restraint on trade, in violation of Ky. Rev. Stat. § 367.175, against all Defendants. "KRS § 367.175, which prohibits the 'restrain of trade and formation of monopolies[,]' is based upon Sections 1 and 2 of the Sherman Anti-Trust Act." *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 874 (Ky. Ct. App. 2007). Courts addressing claims brought pursuant to Ky. Rev. Stat. § 367.175 have interpreted and applied that statute *in pari materia* with the federal Sherman Act. See *Mendell v. Golden-Farley of Hopkinsville, Inc.*, 573 S.W.2d 346, 349 (Ky. Ct. App. 1978); *Kentucky v. Marathon Petroleum Co.*, LP, 191 F. Supp. 3d 694, 705 (W.D. Ky. 2016); *Conrad v. Bevin*, 2018 U.S. Dist. LEXIS 27736, at *24 (E.D. Ky. Feb. 16, 2018). The Court will do so again here.

Courts have also reasoned that antitrust claims are subjected to a heightened pleading standard. In particular, "allegations of parallel conduct and bare assertions of conspiracy no longer supply an adequate foundation to support a plausible § 1 claim." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902-03 (6th Cir. 2009). Rather, "[t]he essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal[.]" *Foundation for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530 (6th Cir. 2001). "To demonstrate the existence of an antitrust injury, a plaintiff must show that a defendant's action has harmed competition, not just an individual competitor." *Kitchens v. Nat'l Bd. of Med. Exam'rs*, 2025 U.S. Dist. LEXIS 14535, at *15 (E.D. Ky. Jan. 28, 2025) (citing *Midwest Agency Servs. Inc., v. JP Morgan Chase Bank*, N.A., 2010

25

U.S. Dist. LEXIS 22457 at *4 (E.D. Ky. Mar. 11, 2010); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).  Regardless of whether the claim asserts a violation of Section 1 or 2 of the Sherman Act, the plaintiff must begin by defining the relevant market. *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 962 (6th Cir. 2004).

In the First Amended Complaint, Custom Septic contends that the actions of the Defendants "violate § 367.170 [sic], which states that 'every contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful,' and furthermore provides that '[i]t shall be unlawful for any person or persons to monopolize, attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in this Commonwealth." [R. 1-1 at 195-96.]  This, essentially, asserts claims equivalent to both Sections 1 and 2 of the Sherman Act.  Furthermore, Custom Septic defines the relevant market, albeit loosely, as the market of septic tank installation services in the Central Kentucky geographic area.  As a general matter, "market definition is a highly fact-based analysis that requires discovery." *Found. for Interior Design Educ. Research*, 244 F.3d. at 531 (6th Cir. 2001) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992)).  Even if this feeble attempt at defining the market is sufficient, however, Custom Septic's claims fall short here on several additional bases.[78]

---

[7] "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 961 (6th Cir. 2004) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).

[8] "We employ the 'reasonable interchangeability' standard as the method to define the relevant product or service market.  Under that standard, we assess '(1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's products or services.'" *Comprehensive Sec. v. Metro Gov't of Nashville & Davidson County*, 2022 U.S. App. LEXIS 6050 at *13 (6th Cir. Mar. 7, 2022) (quoting *White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983)).

**1**

Ky. Rev. Stat. § 367.175(1) is the state analog to Section 1 of the Sherman Act, and provides, "[e]very contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful." Ky. Rev. Stat. § 367.175(1); *cf.* 15 U.S.C. § 1 ("[e]very contract, combination in the form of trust or otherwise, or conspiracy, in the restraint of trade or commerce among the several states, or with foreign nations…").  Courts interpreting Section 1 claims apply two methods of interpretation: the "rule of reason" and "the per se rule of illegality." *Kitchens*, 2025 U.S. Dist. LEXIS 14535, at *17.

Per se illegality applies only to a narrow category of circumstances.  "The per se standard recognizes there are some methods of restraint that are so inherently and facially anti-competitive that an elaborate and burdensome inquiry into a demonstrable economic impact on competition in a relevant market is not required." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434-35 (6th Cir. 2008) (citing *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).  For more than a century there were two possible grounds on which a per se violation could be demonstrated: (1) "a 'group boycott' alleging a horizontal agreement among competitors, and (2) a vertical price fixing conspiracy." *Id.* (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998); *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 986-87 (6th Cir. 2001).  However, in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, the Supreme Court overruled the vertical price fixing standard[9]; thus, "all vertical price restraints are [now] to be judged under the rule-of-reason standard." *Id.*  Consequently, "[o]nly a group boycott through horizontal agreement can constitute a per se violation." *Id.*

---

[9] See *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 887 (2007), overruling *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911).

Custom Septic does not plead a group boycott via horizontal agreement and, thus, does not establish a per se violation.[10]  In essence, Custom Septic argues that FujiClean and Hydrodynamic conspired to restrain trade through their collective actions.  Hydrodynamic and FujiClean cannot create a horizontal agreement which constitutes a per se violation because they are not competitors.  FujiClean, a manufacturer, and Hydrodynamic, a regional distributor, operate in different sectors of the septic tank industry but do not compete with one another.  In other words, this would constitute a vertical, rather than horizontal, arrangement.  Consequently, Custom Septic can assert a § 1 claim, if at all, by virtue of the rule-of-reason standard.

A rule of reason analysis "requires a court to analyze the history of the restraint and the restraint's effect on competition." *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003) (citing *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir. 1998)).  To do so, Courts employ a burden shifting framework. *Id*. (citing *Calif. Dental Ass'n v. FTC*, 526 U.S. 756, 775 n. 12 (1999)).  "First, the plaintiff must establish that the restraint produces significant anticompetitive effects within the relevant product and geographic markets." *Id*. (citing *Tanaka v. Univ. of Southern Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)).  "'If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects' to establish that the alleged conduct justifies the otherwise anticompetitive injuries." *Id*.  Then, finally, "[i]f the defendant is able to demonstrate procompetitive effects, the plaintiff then must show that any legitimate objectives can be achieved in a substantially less restrictive manner." *Id*. (citing *Law*, 134 F.3d at 1019).

---

[10] "In [*Com-Tel, Inc. v. Du Kane Corp.*], the Sixth Circuit adopted the Second Circuit's approach in distinguishing between horizontal and vertical group boycotts.  The Second Circuit reasons that horizontal group boycotts are 'naked restraints of trade with no purpose except stifling competition' and, therefore, per se violations.  However, because vertical group boycotts might promote certain efficiencies such as lower prices or more efficient distribution, such alleged restraints must be analyzed under the rule of reason. *KASP, Inc. v. Adesa Lexington, LLC*, 2006 U.S. Dist. LEXIS 6372, at *17-18 (E.D. Ky. Feb. 17, 2006) (citing *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.), cert. denied, 439 U.S. 946 (1978)).

28

Considering the procedural posture of this case, we look at this juncture only to find whether the plaintiff satisfied its initial burden under the Section 1 burden shifting framework. To do so, the plaintiff must demonstrate: "(1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to that conduct or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy." *Sancap Abrasives Corp. v. Swiss Indus. Abrasives*, 19 F. App'x 181, 187 (6th Cir. 2001) (citing *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989)). The burden cannot "shift" to the defendant unless the plaintiff has made this initial showing and, therefore, can survive a motion for judgment on the pleadings.

Fatal to Custom Septic's Section 1 claim is the complete lack of a valid antitrust injury. "To survive a motion to dismiss, [the plaintiff] must do more than allege that it suffered injuries as a result of defendants' actions – it must allege those actions harmed competition in the marketplace." *KASP, Inc. v. Adesa Lexington, LLC*, 2006 U.S. Dist. LEXIS 6372, at \*21 (E.D. Ky. Feb. 17, 2006) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)). "The welfare of a particular competitor who may be hurt as the result of some trade practice is [not] the concern … of the federal antitrust laws." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)); see also *KASP, Inc.*, 2006 U.S. Dist. LEXIS 6372, at \*22 ("Anti-trust laws are concerned with protecting consumer interests in competition, not in protecting competitors from each other.") (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)).

Here, Custom Septic does not even attempt to allege that the allegedly anticompetitive concerted actions taken by Hydrodynamic and FujiClean harm the consumer market, as opposed

29

to Custom Septic as an individual competitor.  In fact, the First Amended Complaint states simply that "Plaintiffs have been directly and proximately damaged by the wrongful acts of Defendants, entitling them to relief …" [R. 1-1 at 195-96.]  This does not demonstrate harm to the competitive market; it merely alleges that the Defendants' actions have harmed Custom Septic's business.  Nor do the factual assertions when construed as true.  Consequently, in the absence of the showing of the requisite antitrust injury, Custom Septic's § 367.175(1) claim must fail.

**2**

Ky. Rev. Stat. § 367.175(2) is the state analog to Section 2 of the Sherman Act and makes it unlawful "for any person or persons to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in this Commonwealth."  Ky. Rev. Stat. § 367.175(2); *cf.* 15 U.S.C. § 2 ("Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony…").  In order to adequately state a claim under Section 2, a plaintiff must allege that "(1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *United Wholesale Mortg., LLC v. America's Moneyline, Inc.*, 2024 U.S. Dist. LEXIS 58505, at *9 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Smith Wholesale Co. v. Philip Morris USA, Inc.*, 219 F. App'x 398, 409 (6th Cir. 2007)).  "In addition to showing anti-competitive conduct and cause in fact, an antitrust plaintiff must also show an 'antitrust injury,' which is '(1) "injury of the type that the antitrust laws were intended to prevent" and (2) injury "that flows from that which makes defendants' acts

30

unlawful.""" *Rodney v. Northwest Airlines, Inc.*, 146 F. App'x 783, 790 (6th Cir. 2005) (quoting *Louisiana Wholesale Drug Co. v. Hoechst Marion Roussel, Inc. (In re Cardizem CD Antitrust Litig.)*, 332 F.3d 896, 909 (6th Cir. 2003); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  This additional injury requirement, "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* (quoting *Cardizem*, 332 F.3d at 910; *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).

"The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports*, 506 U.S. at 454.  For liability to be established, "the defendant must 'use … monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor."'" *Spirit Airlines v. Northwest Airlines, Inc.*, 431 F.3d 917, 931-32 (6th Cir. 2005) (quoting *Eastman Kodak Co.* 504 U.S. at 482-83; *United States v. Griffith*, 334 U.S. 100, 107 (1948)).

Custom Septic's § 367.175 claim fails for several reasons, regardless of whether the market is properly defined.  For one, Custom Septic has not proven that FujiClean possessed monopoly power in the relevant market.  A plaintiff can demonstrate market power "either directly, by 'showing the exercise of actual control over prices or the actual exclusion of competitors,' or circumstantially, by showing that the defendant has a high market share within a defined market." *Rodney*, 146 F. App'x at 789 (quoting *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999).  Custom Septic has not adequately alleged that FujiClean exercises actual control over the price of septic tanks.  Certainly, FujiClean exercises absolute control over the price of the products it sells in the marketplace, but there is no allegation that FujiClean's actions dictate the overall market for septic tanks.  Nor is there any factual basis to

31

support an argument that FujiClean possesses such a high market share so as to possess a monopolized influence over the septic installation industry.

Custom Septic may contend that, by attempting to effectively freeze Custom Septic out of the installer market for FujiClean products, that FujiClean exerts monopoly power by the "actual exclusion of competitors." This, however, points to the most essential flaw of Custom Septic's claim – it asserts only that FujiClean acts to the detriment of it as a competitor, not to the detriment of the market. In other words, the Section 2 claim is fatally flawed in that it does not plead an "injury of the type that the antitrust laws were intended to prevent[,]" namely, an injury to competition as a whole, rather than an injury sustained by a single competitor. See *Richter Concrete v. Hilltop Concrete*, 691 F.2d 818, 823 (6th Cir. 1982) ("Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor."). Custom Septic makes no attempt to even claim that FujiClean's actions harm the septic tank industry at large, or that the consumer, who the antitrust laws are intended to protect, is in any way affected. In short, then, the alleged injuries sustained by Custom Septic are not those the antitrust laws, either state or federal, were designed to protect.

Relatedly, and stemming from this same core issue, Custom Septic has not pleaded an attempt on FujiClean's part to monopolize either the market of septic tank manufacturers or the market of septic tank installers. There is simply no factual indication that FujiClean is attempting to bolster one of the installers in the relevant market to the exclusion of all other installers.[11] Rather, by Custom Septic's own factual allegations, FujiClean and Hydrodynamic opted to work with a number of other installers – namely Chris Hartman and Paul Ballard – rather than with Custom Septic. Rather than suggesting that FujiClean is attempting to create a

---

[11] This is especially true in view of the aforementioned heightened pleading standards applicable in antitrust litigation.

monopoly around a single installer of its products in Kentucky, the facts instead suggest that FujiClean is attempting to cease working with a single installer, which incidentally has impacted its business. This is not the sort of injury the antitrust laws were designed to remedy.

Consequently, because Count IV fails to plead a viable claim under Ky. Rev. Stat. §§ 367.175(1)-(2) against either Hydrodynamic or FujiClean. Thus, all Defendants are entitled to judgment on the pleading as to this claim.

**F**

Count V of Custom Septic's First Amended Complaint brings a claim for negligence against all Defendants. Despite the phraseology of the language in the pleading, Custom Septic in response to the Defendants' motions claims that it intended to assert a claim for negligent misrepresentation. Under Kentucky law, a negligent misrepresentation arises where a defendant "(1) in the course of his business or a transaction in which he has a pecuniary interest, (2) supplies false information for the guidance of others in their business transactions, if (3) he fails to exercise reasonable care or competence in obtaining or communicating the information and (4) the plaintiff justifiably relied on the information." *Affiliated FM Ins. Co. v. LNR Partners, LLC*, No. 5:21-233-DCR, 2023 U.S. Dist. LEXIS 22911, at *23 (E.D. Ky. Feb. 10, 2023) (quoting *Republic Bank & Trust Cov. v. Bear, Stearns & Co.*, 707 F. Supp. 2d 702, 713 (W.D. Ky. 2010)). "The Kentucky Court of Appeals has explained that an 'elementary element of negligent misrepresentation is justifiable reliance upon the information.'" *Id.* (quoting *Ann Taylor, Inc. v. Heritage Ins. Servs., Inc.*, 259 S.W.3d 494, 496 (Ky. Ct. App. 2008)).

In *Presnell Construction Managers, Inc. v. EH Construction, LLC*, the Kentucky Supreme Court recognized the tort of negligent misrepresentation and adopted the Restatement (Second) of Torts § 552, which provides, in relevant part:

33

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

134 S.W.3d 575, 580 (Ky. 2004) (quoting Rest. (Second) of Torts § 552(1)).  Under § 552, liability is limited and attaches only when two requirements are satisfied: (1) the loss is suffered "by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it[,]" and (2) the loss is suffered "through reliance upon [the misrepresentation] in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." *Id*.  Liability is broader when the defendant is under a public duty to give the information, which is inapplicable here.  In terms of duty, the *Presnell* Court held "that privity is not necessary to maintain a tort action, and, by adopting § 552, we agree that the tort of negligent misrepresentation defines an independent duty for which recovery in tort for economic loss is available." *Presnell*, 134 S.W.3d at 582.  In short, the elements to plead a claim for negligent misrepresentation sound in tort but are unique from a standard negligence action.

In crafting their First Amended Complaint, Plaintiffs framed Count V as a standard negligence claim.  Count V of the First Amended Complaint provides as follows:

161. Plaintiffs reiterate the foregoing Paragraphs as if set forth fully herein.
162. All Defendants owed Plaintiffs a duty of reasonable care to refrain from undertaking actions that would damage the business activities and reputation of Plaintiffs.
163. All Defendants violated this duty of ordinary care through the above-described actions.
164. The Plaintiffs have been directly and proximately damaged by the tortious acts of Defendants, in excess of the jurisdictional requirements of this Court, and are entitled to relief for such damages.

34

[R. 1-1 at 196.]  This makes out the basic elements for a standard negligence claim under Kentucky law.  In their original Motions, Defendants contend that this claim, as pleaded, fails because Custom Septic failed to articulate a duty. [R. 14-1 at 10; R. 15-1 at 11-12.]  They contend that Kentucky law does not recognize a "universal duty of care" and that "[a] plaintiff must show that there is an independent duty of care under Kentucky law to establish a negligence claim."  [R. 15-1 at 12.]

In its response brief to Defendants' motions, Custom Septic effectively attempts to reform its First Amended Complaint.  There, for the first time, Custom Septic alleges that it actually seeks to bring a claim for negligent misrepresentation.  In turn, it contends that "[t]he commercial relationship between the parties gives rise to a duty to provide accurate information." [R. 18 at 28.] (citing *Presnell*, 134 S.W.3d at 580-83).  Custom Septic then points to several factual averments from the First Amended Complaint in which it alleges misstatements on the part of Defendants.  Custom Septic alleges that "[Hydrodynamic] Defendants provided misinformation to Plaintiffs and others about the certifications required to legally install Fuji systems in Kentucky, that Plaintiffs relied upon these representations, and that such reliance resulted in direct financial losses to Plaintiffs and exposed Plaintiffs to significant liability." [R. 18 at 29.]  Custom Septic further alleges that "[Hydrodynamic] has provided misinformation to the Fuji Defendants regarding the Plaintiffs' work and business dealings between [Custom Septic] and [Hydrodynamic], which was relied upon by Fuji in making its decisions regarding its business dealings with Plaintiffs." [*Id*. at 29-30.]  Third, and finally, Custom Septic alleges with respect to FujiClean that "multiple misrepresentations were made in the Dunn Report, which in turn was used as a justification for [Hydrodynamic]'s and Fuji's refusal to continue to sell Fuji products to Plaintiffs." [*Id*. at 30.]

As originally pleaded, Count V amounts to a bare recitation of the elements of a negligence claim, and must be dismissed.  Under Rule 8(a)(2), a viable pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  In the now-fundamental case of *Ashcroft v. Iqbal*, the Supreme Court elaborated on this standard, providing:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation … A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement.

556 U.S. 662, 667-78.  The Plaintiffs' First Amended Complaint consists of a thorough factual summary of the evolving business relationship with Hydrodynamic and FujiClean which ultimately culminated in this litigation. [R. 1-1 at 196.]  Custom Septic incorporates this factual basis into Count V at paragraph 161. [*Id*.]  Yet, the Plaintiffs make no real attempt to explain or even state how those facts give rise to a cause of action at all.  Custom Septic merely states that Defendants broadly owed them "a duty of reasonable care to refrain from undertaking actions that would damages [their] business activities and reputation[.]" [*Id*.]  It then baldly asserts that the duty was breached "though the above-described actions[,]" and that damages were suffered as a result. [*Id*.]  It is not until the Plaintiffs' response briefing that the Parties have any idea which of the 24 pages of factual averments from the First Amended Complaint form the basis of a negligence claim.  The Defendants and the Court are left to guess for themselves.  This is not adequate notice.

In evaluating this claim, the Court is cognizant that "a complaint need not expressly plead

legal theories; it need only 'plead factual allegations that impliedly establish[] at least one viable theory.'" *Lunneen v. Vill. of Berrien Springs*, 2023 U.S. App. LEXIS 25186, at *37 (6th Cir. Sep. 21, 2023) (quoting *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021)).  Rather, "[i]t is only after the moving party seeks summary judgment that a responding party must "come forward with every legal theory on which he relied."  *Id*. (quoting *Dibrell*, 984 F.3d at 1160; *Nat'l Credit Union Admin. v. Mich. Nat'l Bank of Detroit*, 771 F.2d 154, 161 (6th Cir. 1985)).  This notwithstanding, bringing forth *every* legal theory is altogether different than pleading *any* legal theory.  As originally pleaded, Plaintiffs merely assert a universal duty of care, followed by a bare recitation of elements.[12]  This is inadequate to plead a plausible claim under the *Twombly* and *Iqbal* standards.

Even construing Count V as a claim for negligent misrepresentation, the factual assertions in the First Amended Complaint still cannot give rise to a viable claim.  Even if Hydrodynamic provided misinformation to FujiClean about the quality of Custom Septic's work, and misinformation as to its souring business relationship with Custom Septic, Custom Septic acknowledges that this information was given by Hydrodynamic to FujiClean. [R. 18 at 29.]  In order to bring a negligent misrepresentation claim, however, *Presnell* and Rest. § 552 make clear that the plaintiff must be the one to rely upon the misinformation to their detriment.  See Rest. § 552(1) (defendant is liable for "pecuniary loss caused to them by their justifiable reliance upon the information").  In other words, any misinformation here would have been provided by Hydrodynamic to FujiClean.  Custom Septic alleges that FujiClean relied upon this misinformation to Custom Septic's detriment.  Because Custom Septic did not rely on this

---

[12] "Kentucky does not recognize a boundless and general 'universal duty of care.'" *Johnson v. UPS*, 326 S.W.3d 812, 815-16 (Ky. 2010); see also *Jenkins v. Best*, 250 S.W.3d 680, 691 (Ky. Ct. App. 2007) ("despite its value as a 'catch phrase' … the 'universal duty of care,' has no meaning in Kentucky jurisprudence beyond the most general expression of negligence theory …").

misinformation at all, it cannot be the basis for negligent misrepresentation.

Custom Septic's allegation that FujiClean be held liable for negligent misrepresentation fails for the same reason. Custom Septic contends that the Dunn Report contained misinformation that formed the basis of Hydrodynamic and FujiClean's decision to halt the sale of FujiClean products to Custom Septic, which in turn harmed their business. [R. 18 at 29-30.] Again, however, Custom Septic does not claim that it relied on the Dunn Report in any way. It merely argues that it suffered harm because of others' reliance on the Dunn Report. This does not establish liability for negligent misrepresentation under the plain language of § 552.

Lastly, while Custom Septic does allege that it relied on Hydrodynamic's misrepresentations regarding the requisite certifications required to legally install FujiClean systems in Kentucky, a claim for negligent misrepresentation on that basis would also inevitably fall short for two key reasons. First, even assuming Hydrodynamic provided Custom Septic with incorrect information about the requisite certifications, Custom Septic does not allege that it relied upon the misinformation at all. Rather, Custom Septic provides that "[u]pon further investigation, Plaintiffs learned that for Fuji systems that discharge to the surface, [an] additional certification is required by the state of Kentucky. This certification – the Wastewater I – is obtained through the Kentucky Division of Water." [R. 1-1 at 175; R. 18 at 34-35.] Further, Plaintiffs provide "Mr. Thornton therefore obtained this additional certification, which further authorizes him to provide [operations and maintenance] for surface discharging Fuji systems." [*Id.*] In Custom Septic's own words, Hydrodynamic provided it with misinformation, it independently researched the information further, learned of its inaccuracy, and rectified the situation by obtaining the required certification. In other words, they did not rely on Hydrodynamic's misinformation at all. We need not even address whether the reliance was

38

justified, because there was no reliance at all.

Second, Custom Septic further contends that they have been damaged because "Plaintiffs provide Operations and Maintenance … services to end users of the Fuji product, and thus are at risk of liability arising from Defendants' failure to obtain the necessary permits and inspections to ensure regulatory compliance for Fuji products." [R. 1-1 at 175; R. 18 at 35.]  Further, they allege "non-compliant surface-discharging Fuji systems have been installed by other contractors who lack the necessary Wastewater I certification to perform this work." [*Id.*]  The problems here are twofold.  The damages here are speculative.  Plaintiffs do not allege that they suffered harm due to Hydrodynamic's promulgation of misinformation, they only suggest that they are "at risk" of future harm.  Furthermore, and more fatally, this paragraph suggests that the harm that may eventually befall Custom Septic is the result of other contractors' reliance upon Hydrodynamic's misinformation.  Put differently, Custom Septic contends that, in the future, they may suffer expenses stemming from their operations and maintenance obligations on non-compliant septic tanks, installed by other installers, who relied upon Hydrodynamic's misinformation.  This, again, undercuts the plain text of *Presnell* and § 552, which requires that the plaintiff rely on the misinformation to their detriment.

In sum, Count V must be dismissed.  The standard negligence claim, as originally pleaded, fails to state a plausible claim for negligence and amounts to a bare recitation of the elements.  But even if the Court were to reform the pleading into a claim for negligent misrepresentation, Custom Septic's claim still falls well short.  Consequently, all Defendants are entitled to judgment as to Count V.

**G**

In Count VI of the First Amended Complaint, Custom Septic brings a claim for

39

negligence per se against all Defendants, premised on their alleged statutory violations of the Kentucky Consumer Protection Act (i.e., Count I), Kentucky Unfair Trade Practices Act (i.e., Count II), Kentucky Uniform Trade Secrets Act (i.e., Count III), and an illegal restraint on trade under Ky Rev. Stat. § 367.175 (i.e., Count IV).  Custom Septic acknowledges that this claim was intentionally pleaded in the alternative, in the event that the Court does not find an avenue of recovery under the aforementioned counts.

Kentucky's negligence per se statute provides that, "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty of forfeiture is imposed for such violation." Ky. Rev. Stat. §446.070.  "The statute creates a private right of action in a person damaged by another person's violation of any statute that is penal in nature and provides no civil remedy, if the person damaged is within the class of persons the statute intended to be protected." *Hargis v. Baize*, 168 S.W.3d 36, 40-41 (Ky. 2005) (citing *State Farm Mut. Auto Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988); *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985); *Hackney v. Fordson Coal Co.*, 19 S.W.2d 989, 990 (Ky. 1929)).  Federal courts applying Kentucky's negligence per se statute have reached the same conclusion. See e.g., *Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton*, 24 F. Supp. 2d 755, 773 (W.D. Ky. 1998) (holding that because the Kentucky Consumer Protection Act provided a specific remedy, "an alternative remedy should not be available under 446.070.").

Likewise, here, Custom Septic does not have an available remedy under Ky. Rev. Stat. §446.070 because the specific statutes at issue each provide their own specific remedies.  The Kentucky Consumer Protection Act provides consumers with a specific remedy at Ky. Rev. Stat. §367.220.  The Kentucky Unfair Trade Practices Act sets forth remedies at Ky. Rev. Stat.

40

§365.070.  Likewise, the Kentucky Uniform Trade Secrets Act provides for injunctive relief at Ky. Rev. Stat. § 365.882 and monetary damages under Ky. Rev. Stat. § 365.884.  And, finally, claims for illegal restraints on trade under Ky. Rev. Stat. § 367.170 are afforded specific remedies under Ky. Rev. Stat. § 367.220.  Consequently, Custom Septic can recover, if at all, under the specific remedies ascribed under each of these statutes, rather than by virtue of a negligence per se claim under Ky. Rev. Stat. § 446.070.  Thus, all Defendants are entitled to judgment on Count VI.

## H

Count VII pleads a claim for defamation against all Defendants; however, only Hydrodynamic seeks judgment on the pleadings.  To plead a viable defamation claim under Kentucky law, the plaintiff must demonstrate: (1) "a false and defamatory statement concerning another," (2) "an unprivileged publication to a third party," (3) "fault amount at least to negligence on the part of the publisher," and (4) "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Buckner v. Hilton Worldwide Holdings Inc.*, 2025 U.S. App. LEXIS 28321, at *4 (6th Cir. Oct. 28, 2025) (quoting *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014)).  The fourth element implies that there are two distinct categories of "actionable words": "those actionable per se which necessarily damages plaintiff; and … those which are actionable in consequence of extrinsic facts showing the circumstances under which they were written or spoken and the damages resulting therefrom." *Chatterjee v. CBS Corp.*, 2020 U.S. Dist. LEXIS 20346, at *21 (E.D. Ky. Feb. 6, 2020) (citing *Digest Publishing Co. v. Perry Publishing Co.*, 284 S.W.2d 832, 834 (Ky. 1955); *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2006)).

41

"[W]ords are said to be actionable per se when there is a conclusive presumption of both malice and damage." *Toler*, 458 S.W.3d at 282 (citing *Walker v. Tucker*, 295 S.W. 138, 139 (Ky. 1927)). The paradigmatic example of a per se actionable statement is "a communication involving false allegations of unfitness to perform a job[.]" *Id.* Where a communication is construed as per se defamatory, "recovery is permitted without proof of special damages because injury to reputation is presumed and the words are actionable on their face."[13] *Id.* The determination of whether words qualify as defamation per se is a question of law. *Chatterjee*, 2020 U.S. Dist. LEXIS 20346, at *21 (citing *Baker v. Clark*, 218 S.W. 280 (Ky. 1920)).

Yet even where words are per se defamatory, there are certain circumstances in which such communications "are allowed because the societal interest in the unrestricted flow of communication is greater than the private interest." *Toler*, 458 S.W.3d at 282. Specifically, Kentucky courts recognize such a qualified privilege "where the communication is one in which the party has an interest and it is made to another having a corresponding interest." *Id.* Generally, in a per se defamation context, both the falsity and malicious character of the statement at issue is presumed.[14] This presumption can be negated, however, if the qualified privilege applies. Put differently, then, "where publications are [defamatory] per se, yet where the publication is made under circumstance disclosing qualified privileges, it is relieved of that presumption and the burden is on the plaintiff to prove actual malice." *Weinstein v. Rhorer*, 42 S.W.2d 892, 895 (Ky. 1931).

---

[13] Where a statement is not defamatory per se, the plaintiff must demonstrate their defamatory nature through a showing of special damages, which are "those beyond mere embarrassment which supports actual economic loss." *Chatterjee*, 2020 U.S. Dist. LEXIS 20346, at *20 (citing *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981)). Special damages "must be a loss of pecuniary character, or the loss of some substantial or material advantage." *Id.* (quoting *Williams v. Riddle*, 140 S.W. 661, 664 (Ky. 1911)).

[14] Notably, the Court in *Toler* overturned longstanding precedent in drawing a more clear-cut divide between findings of falsity and malice in the defamation context. *Toler*, 458 S.W.3d at 287. Specifically, the *Toler* Court stated "both malice and falsity must be shown for a plaintiff to overcome the qualified privilege." *Id.* A mere showing of falsity alone will no longer carry an automatic showing of malice.

This privilege is not without limit, however.  "Abuse of the qualified privilege may be shown in several ways, some indicating will or maliciousness more directly than others.  These include: (1) 'the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter'; (2) the 'publication of the defamatory matter for some improper purpose'; (3) 'excessive publication'; or (4) 'the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged.'" *Toler*, 458 S.W.3d at 284 (citing Restatement (Second) of Torts § 596 cmt. a (1977)).  The burden of demonstrating such an abuse of this qualified privilege falls to the plaintiffs. *Id*. (citing *Weinstein*, 42 S.W.2d at 895.

Plaintiffs' claim with respect to Count VII consist of two sentences.  First, Plaintiffs state "Defendants have published to third parties unprivileged, false, and defamatory statements regarding Plaintiffs, as described in detail, *supra*, including but not limited to the specific misrepresentations in the Report and statements to the effect that Plaintiffs are not skilled, adept, or following installation protocols with regard to their installation of FujiClean systems in Kentucky." [R. 1-1 at 197.]  Next, the Plaintiffs state "Defendants' publishing of false, unprivileged, false, and defamatory statements regarding Plaintiffs has damaged Plaintiffs in excess of the jurisdictional threshold of the Court in an amount to be established at trial." [*Id*.]

Hydrodynamic contends that these statements, in view of the factual allegations set forth in the complaint, are insufficient to plead a viable defamation claim.  More specifically, Hydrodynamic contends that it did not play a part in the publication of the Dunn Report, which it states "is the only document alleged to have been published to third parties," and thus only FujiClean can be held liable for defamation. [R. 22 at 5.]  This, however, oversimplifies the factual allegations contained in the First Amended Complaint.  Plaintiffs' defamation claim rests not only on the Dunn Report, but also upon statements made, in writing, by Hydrodynamic to

43

FujiClean "regarding Plaintiffs' work and the business dealings between [Custom Septic] and [Hydrodynamic]." Custom Septic further alleges that these communications contained "incomplete or tortiously inaccurate information" to FujiClean. [R. 1-1 at 177.] Plaintiffs claim that this information not only harmed Custom Septic's relationship with FujiClean, but then further resulted in assertions made by FujiClean in the Dunn Report. In other words, Custom Septic effectively argues that in the absence of allegedly defamatory statements made by Hydrodynamic to FujiClean, the scope and severity of the Dunn Report may have been substantially reduced.

Many questions remain unanswered as to Custom Septic's defamation claims, and the burden shifting process discussed above has yet to occur. Discovery on this claim will likely yield information which will facilitate and illuminate this process. At bottom, however, the Court finds that the factual assertions pleaded by Custom Septic in the First Amended Complaint are sufficient to survive a motion for judgment on the pleadings.

**I**

In Count VIII of the First Amended Complaint, Custom Septic brings claims for intentional and/or negligent infliction of emotional distress against all Defendants. "To state a claim for intentional infliction of emotional distress under Kentucky law, [the plaintiff needs] to allege facts showing that the defendants acted intentionally or recklessly, and in a manner so egregiously outrageous and intolerable, that it caused him severe emotional distress." *Chick v. Taylor Cnty.*, 2026 U.S. App. LEXIS 4489, at *12 (6th Cir. Feb. 11, 2026) (citing *Osborne v. Payne*, 31 S.W.3d 911, 913-14 (Ky. 2000)). "And [a] negligent infliction of emotional distress claim [requires the plaintiff] to allege facts that would support the four typical elements of a negligence claim – duty, breach, causation, and damages – with the caveat that the emotional

44

injury must be 'severe.'" *Id*. (citing *Osborne v. Kenney*, 399 S.W.3d 1, 17-18 (Ky. 2012)). "In Kentucky, only plaintiffs who experience 'severe' or 'serious' emotional injuries can recover under either alleged tort." *Id*.

**1**

To begin, the Court agrees that Defendants are entitled to judgment on the pleadings with respect to a claim for intentional infliction of emotional distress. Even construing the facts in the First Amended Complaint in the light most favorable to the Thorntons, an intentional infliction of emotional distress claim falls well short of the legal standard. Perhaps most critically, none of the statements mentioned throughout the First Amended Complaint, nearly all of which relate to Custom Septic's operations, "deviat[es] from all reasonable bounds of decency" sufficient to establish a viable claim. *Craft v. Rice*, 671 S.W.2d 247, 250 (Ky. 1984). Furthermore, even assuming such comments were actually made, the Thorntons do not allege that these statements were made for the express intent of causing them emotional harm. Rather, it is equally, if not more, likely that these statements were made for an array of other purposes related to the business transactions at issue. Consequently, the Thorntons have failed to adequately plead a claim for intentional infliction of emotional distress.

**2**

Turning, then, to the claim for negligent infliction of emotional distress, the Defendants claim that they are entitled to judgment because the Thorntons have failed to demonstrate that Defendants owed them a duty. Further, Hydrodynamic argues that no such cause of action exists under Kentucky law. The Court will address each argument in turn.

At the outset, the Court must address Hydrodynamic's contention that "the independent tort of negligent infliction of emotional distress does not exist in the Commonwealth of

45

Kentucky." In *Osborne v. Kenney*, the Kentucky Supreme Court departed from the so-called physical impact rule – which required that emotional distress injuries manifest physically in the plaintiff in order to be recoverable. 399 S.W.3d at 5-6. In resetting the parameters of actions for negligent infliction of emotional distress, the Court determined that "these cases should be analyzed under general negligence principles." *Id*. at 17. Furthermore, it reasoned that "to ensure claims are genuine … that recovery should be provided only for 'severe' or 'serious' emotional injury." *Id*. To define "severe or serious" injury, the Court further provided that "[d]istress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice." *Id*. at 17-18. Further, it is required that "a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment." *Id*. at 17-18. In short, *Osborne v. Kenney* stands not only for the proposition that such a cause of action exists under Kentucky law, but it also delineates the requisite legal standard at length.

Hydrodynamic argues that, *Osborne v. Kenney* notwithstanding, the freestanding tort of negligent infliction of emotional distress is foreclosed under Kentucky law by *Childers v. Geile*. [R. 14-1 at 13; R. 22 at 6-7.] Hydrodynamic's interpretation overextends the Court's holding in *Childers*. A mere matter of months prior to *Osborne v. Kenney*, the Kentucky Supreme Court stated that "[t]he purpose behind recognizing the tort of intentional infliction of emotional distress was to allow a cause of action for severe emotional distress, caused by truly outrageous behavior, where there was no remedy because the victim did not have an injury directly to his person or intangible personal attributes such as reputation." *Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012). In other words, *Childers* stands for the proposition that "[t]he tort of intentional infliction of emotional distress is thus a 'gap-filler' tort that is only available where the injury at issue cannot be addressed by more traditional torts." *Hall v. City of Williamsburg*, 2017 U.S.

46

Dist. LEXIS 79603, at *46-47 (E.D. Ky. May 24, 2017).  Thus, rather than circumscribing

negligent infliction of emotional distress, the Court's holding in *Childers* clarified the scope of

actions for intentional infliction of emotional distress.

In attempting to argue that an independent claim for negligent infliction of emotional

distress will not lie, Hydrodynamic points the Court to a quote from *Childers* which provides,

"emotional distress, standing alone, does not result in liability from an actor's conduct unless his

intentional (or reckless) conduct is aimed toward causing emotional distress, is outrageous, and

does cause severe emotional distress." [R. 14-1 at 13] (quoting *Childers*, 367 S.W.3d at 582).

Rather than eliminating, or narrowing, the tort of negligent infliction, this statement clarifies the

requisite showing for the first element of intentional infliction.  *Childers* requires that the

defendant must have acted with the specific intent of causing emotional distress, rather than an

intent to inflict some other tort with the mere incidental result of emotional harm. *Childers*, 367

S.W.3d at 580.  This conclusion is further illuminated by looking to the case the *Childers* Court

relied upon, and cited to, in making this statement.  In *Rigazio v. Archdiocese of Louisville*, the

Court sought to clarify the origins and scope of the tort of intentional infliction of emotional

distress, by virtue of the Restatement (Second) of Torts[15]:

> Taking into account the history of the tort of outrage, and its reason for being as a "gap-filled" providing redress for extreme emotional distress in those instances in which the traditional common law actions did not, we believe that § 47 [of the Restatement (Second) of Torts] recognizes that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.  Recovery for emotional distress in those instances must be had under the appropriate traditional common law action.  The tort of outrage was

---

[15] "Under Kentucky law, outrage and intentional infliction of emotional distress are interchangeably used to describe the same tort." *Jones v. Georgetown Coll.*, 2024 U.S. Dist. LEXIS 56179, at *18 n.1 (E.D. Ky. Mar. 28, 2024) (citing *Burgess v. Taylor*, 44 S.W.3d 806, 811 (Ky. Ct. App. 2001)).

intended to supplement the existing forms of recovery, not swallow them up.

*Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298-99 (Ky. 1993).  Thus, in sum, *Childers* does not go so far as to hold that negligent infliction of emotional distress is a mere derivative tort or is otherwise circumscribed under Kentucky law.  Rather, its holding is more narrowly tailored and clarifies the scope of intentional infliction of emotional distress, a separate and distinct cause of action.

That being said, Custom Septic still falls short of adequately pleading a claim for negligent infliction of emotional distress.  Critically, Plaintiffs fail to adequately plead the existence of a duty.  In the First Amended Complaint, Plaintiffs obtusely asserted, "[a]ll Defendants have a duty to conform their conduct in such a way as not to injure Plaintiffs." [R. 1-1 at 197.]  This, in effect, rests the claim for negligent infliction upon a "universal duty of care" which is not permitted under Kentucky law. See *Johnson*, 326 S.W.3d at 814-15; *Jenkins*, 250 S.W.3d at 691.  Further, Custom Septic's response briefing provides little clarification on this point either.  There, Plaintiffs try to salvage their claim by stating that a legal duty is adequately pleaded elsewhere in the First Amended Complaint, namely at Count V's claim for negligent misrepresentation and at Count IX's claim for tortious interference with business relations. [R. 18 at 33.]  This is inadequate, however, because these torts impose distinct duties, derived from different elements than a standard negligence claim, let alone the fact that this argument was not presented within the four corners of the pleadings.  Furthermore, these claims seek to recover damages sustained by Custom Septic, not the Thorntons, stemming from their business relationship with Defendants.  At bottom, Plaintiffs have not identified the source of any viable duty owed by Defendants to the Thorntons as individuals, and, thus, their claim for negligent infliction of emotional distress falls short.

**J**

Count X of the FAC seeks to bring a claim for fraud against all Defendants, premised on the same alleged misstatements discussed prior as to Count V's claim for negligent misrepresentation.  To establish a fraud claim under Kentucky law, a plaintiff must allege: (1) a material representation (2) that is false, (3) known to be false or made recklessly, (4) made with inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury. *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  The Federal Rules of Civil Procedure require a party alleging fraud also to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Rule 9(b) mandates that a plaintiff specify the "who, what, when, where, and how of the alleged fraud." *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 410-11 (6th Cir. 2022) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).  This means the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. at 411 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).  The plaintiff must also provide a description of "the fraudulent scheme" and "the resulting injury." *Id*. (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466-67 (6th Cir. 2011)).  "In an action for fraud, it is not necessary to prove the amount of damages with certainty, but only to establish with certainty the existence of damages." *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999).

State-law fraudulent misrepresentation claims brought in federal court must meet this heightened pleading standard. *Newberry v. Silverman*, 789 F.3d 636, 645 (6th Cir. 2015).  When there are multiple defendants, a plaintiff must specify which defendant made each allegedly fraudulent misrepresentation so that "a particular defendant [can] determine with what it is

49

charged." *Hoover v. Langston Equip. Assocs. Inc.*, 958 F.2d 742, 745 (6th Cir. 1992). The purpose of Rule 9(b) is to give defendants fair notice of the allegations against them so they can prepare an informed pleading responsive to the specific allegations of fraud. See *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503-04 (6th Cir. 2008).

This claim fails for essentially the same reason as Count V's claim for negligent misrepresentation – the Plaintiffs fail to "establish with certainty the existence of damages." Both the fraud and negligent misrepresentation claims are premised upon the alleged misstatements about the requisite certifications installers must obtain in order to install FujiClean tanks in Kentucky. [R. 1-1 at 175.] Custom Septic, however, clarifies that it conducted its own research, discovered the inaccuracies in FujiClean and Hydrodynamic's information, and obtained the required certification. [*Id.*] Custom Septic claims, therefore, that it acted pursuant to Kentucky law while other installers may have blindly relied upon FujiClean and Hydrodynamic's false assertions. [*Id.*] Custom Septic further alleges that it might incur future damages because they may provide operations and maintenance services upon a tank installed by a different installer who lacked the requisite certifications. [*Id.*] This does not prove, with certainty, the existence of any damages. By the Plaintiffs' own words, they are "at risk of liability[.]" [*Id.*] At least with respect to the allegedly fraudulent misrepresentations made by Defendants, Plaintiffs do not allege to have suffered any damages at this time, or that they are certain to incur future damages – only that they *might* incur some damages in the future. Such "someday" allegations of damages are inadequate to give rise to a viable fraud claim, because the Court is uncertain that any damages have been incurred.

As a result, the Defendants are entitled to judgment on the pleadings with respect to Count X, as the Plaintiffs have failed to make out a plausible fraud claim under Kentucky law.

50

## K

Hydrodynamic seeks dismissal or judgment on Count XI of the First Amended Complaint, which asserts a claim for civil conspiracy against all Defendants. Under Kentucky law, "civil conspiracy is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Christian Cnty. Clerk v. Mortgage Elec. Registration Sys.*, 515 F. App'x 451, 459 (6th Cir. 2013) (quoting *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, 2010 Ky. App. Unpub. LEXIS 555, at *38 (Ky. Ct. App. July 9, 2010); *Davenport's Adm'x v. Crummies Creek Coal Co.*, 184 S.W.2d 887, 888 (Ky. 1945)). A civil conspiracy claim must fail, as a matter of law, where it lacks an underlying tort to be based upon. *Christian County Clerk*, 515 F. App'x at 459 (citing *Stonestreet Farm*, 2010 Ky. App. Unpub LEXIS 555, at *39)). "[I]n order to prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *James v. Wilson*, 95 S.W.3d 875, 897 (Ky. 2002) (citing *Montgomery v. Milam*, 910 S.W.3d 237, 239 (Ky. 1995), overruled on other grounds in *Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229, 236 (Ky. 2013)). At bottom, however, "[a] conspiracy is inherently difficult to prove" and "the burden is on the party alleging that a conspiracy exists to establish each and every element of the claim in order to prevail." *Id.* at 896.

Here, Custom Septic's civil conspiracy claim is not freestanding; rather it is premised upon the various other tortious violations pleaded elsewhere in the First Amended Complaint. To be more specific, the First Amended Complaint pleads six torts against all Defendants: negligence / negligent misrepresentation, negligence per se, defamation, infliction of emotional distress, tortious interference with business, and fraud. In the First Amended Complaint,

Plaintiffs claim that "[a]ll Defendants, in engaging in the course of conduct described supra, acted pursuant to a concerted plan of action, scheme, or agreement to damage Plaintiffs business reputation and relationships, in an effort to exclude them from the Fuji market in Kentucky and elsewhere." [R. 1-1 at 199.] Custom Septic further alleges that in doing so, the Defendants "had full knowledge of the wrongful and illegal nature of their conduct," and each "took independent action in furtherance of this agreement, as described *supra*." [*Id.*]

Several of these claims do not survive these motions for judgment on the pleadings, as already set forth. However, insofar as an underlying tort claim survives, Plaintiffs have adequately pleaded civil conspiracy. Although civil conspiracy will not provide an independent cause of action, it will nonetheless remain an avenue for recovery against multiple defendants, provided that Plaintiffs can meet their high burden of proof. Thus, Hydrodynamic's motion for judgment will be denied as to civil conspiracy.

### III

The foregoing begs the question: what remains of Plaintiffs' First Amended Complaint? Court Two, which claims a violation of the Kentucky Unfair Trade Practices Act, remains solely against Hydrodynamic, Kelli Oakley, Mike Beal, and Alan Davies. Count Seven, which seeks to bring a defamation claim under Kentucky law, survives only as to FujiClean, Mike Dunn, and Scott Samuelson. Counts Three, Nine, Eleven, and Twelve survive in their entirety, either because no party sought judgment on the pleadings, or because their motion to that effect was denied. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Defendants' Motions for Judgment on the Pleadings **[R. 14; R. 15]** are

    **GRANTED in part** and **DENIED in part**;

2. The Defendants' Motions to Strike Exhibits **[R. 19; R. 21]** are **GRANTED**;

3. Counts One, Four, Five, Six, Eight, and Ten are **DISMISSED** in their entirety as to all Defendants;

4. Count Two is **DISMISSED** as to Defendants FujiClean, Mike Dunn, and Scott Samuelson;

5. Count Seven is **DISMISSED** as to Hydrodynamic, Kelli Oakley, Mike Beal, and Alan Davies;

6. The Plaintiffs' Exhibits located at **[R. 18-1; R. 18-2; R. 18-3; R. 18-4; R. 18-5; R. 18-6]** are **STRICKEN** from the record.

This the 15th day of June 2026.

Gregory F. Van Tatenhove
United States District Judge